UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE JUAREZ,<br><br>                    Plaintiff,<br><br>          v.<br><br>CARMEN BUTTS, et al.,<br><br>                    Defendants. | No.  2:15-cv-1996 JAM DB P<br><br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff alleges defendants were deliberately indifferent to his serious pain and that they retaliated against him for filing prison appeals and for filing this suit.  Before the court is defendants' motion for summary judgment.  For the reasons set forth below, this court will recommend defendants' motion be granted.

**BACKGROUND**

Plaintiff is incarcerated at the California Health Care Facility ("CHCF").  He complains of conduct that occurred there in 2014 and 2016-2017.  This case is proceeding on claims in plaintiff's fourth amended complaint against defendants Drs. Hlaing, Atienza, and Bhatia.  (See ECF Nos. 74, 81, 92.)  Plaintiff's primary complaints are that defendants knew he was suffering pain but refused to provide him sufficient pain medication.  In addition, plaintiff alleges Atienza

////

1

refused him pain medication in retaliation for plaintiff's filing a prison appeal regarding Atienza's conduct.

On June 6, 2018, the court granted, in part, defendants' motion to dismiss.  The court held that plaintiff's claims regarding the treatment of his pain prior to October 2014 are barred by the doctrine of res judicata.  (ECF Nos. 62, 71.)

All defendants have answered the complaint.  (ECF Nos. 105, 106, 121.)  On December 20, 2019, defendants filed the present motion for summary judgment.  (ECF No. 125.)  Plaintiff filed an opposition (ECF No. 130) and defendants filed a reply (ECF No. 131).

**MOTION FOR SUMMARY JUDGMENT**

**I.  Summary Judgment Standards under Rule 56**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).

When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case."  Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the

1   nonmoving party's case necessarily renders all other facts immaterial." Id.  In such a

2   circumstance, summary judgment should be granted, "so long as whatever is before the district

3   court demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

4        If the moving party meets its initial responsibility, the burden then shifts to the opposing

5   party to establish that a genuine issue as to any material fact actually does exist. See Matsushita

6   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

7   existence of this factual dispute, the opposing party typically may not rely upon the allegations or

8   denials of its pleadings but is required to tender evidence of specific facts in the form of

9   affidavits, and/or admissible discovery material, in support of its contention that the dispute

10  exists. See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  However, a complaint that

11  is submitted in substantial compliance with the form prescribed in 28 U.S.C. § 1746 is a "verified

12  complaint" and may serve as an opposing affidavit under Rule 56 as long as its allegations arise

13  from personal knowledge and contain specific facts admissible into evidence. See Jones v.

14  Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir.

15  1995) (accepting the verified complaint as an opposing affidavit because the plaintiff

16  "demonstrated his personal knowledge by citing two specific instances where correctional staff

17  members . . . made statements from which a jury could reasonably infer a retaliatory motive");

18  McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987); see also El Bey v. Roop, 530 F.3d

19  407, 414 (6th Cir. 2008) (Court reversed the district court's grant of summary judgment because

20  it "fail[ed] to account for the fact that El Bey signed his complaint under penalty of perjury

21  pursuant to 28 U.S.C. § 1746.  His verified complaint therefore carries the same weight as would

22  an affidavit for the purposes of summary judgment.").  The opposing party must demonstrate that

23  the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

24  governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury

25  could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S.

26  242, 248 (1986).

27       To show the existence of a factual dispute, the opposing party need not establish a

28  material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be

3

shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." Walls v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

## II.  Eighth Amendment Claims

Plaintiff alleges each defendant failed to provide him with medication sufficient to manage his pain. Specifically, he alleges that in May 2014, Dr. Hlaing discontinued his pain medication and failed to prescribe a replacement. In his deposition, plaintiff testified that this is his only claim against Hlaing. (ECF No. 125-9 at 299-300.) However, in his opposition brief, plaintiff states that he is also alleging Hlaing failed to provide pain medication in 2016. (ECF No. 130 at 18.) Plaintiff states that he had been prescribed tramadol, 100 mg. three times per day. Then, in 2016, he was moved to a new part of the prison and Hlaing discontinued this pain medication. (Id. at 25.)

With respect to plaintiff's claim regarding Hlaing's conduct in 2014, as described above, the court held that plaintiff's claims regarding the management of his pain before October 2014 are barred by the doctrine of res judicata. Therefore, they will not be considered here. Plaintiff's claims regarding Hlaing's conduct in 2016 are discussed below.

Plaintiff alleges Dr. Atienza discontinued his pain medications in June 2017 and in October 2017 reduced his tramadol prescription.  In his opposition, plaintiff states that he had a meeting with the chief medical officer regarding pain management and it was determined that he should be prescribed 100 mg. of tramadol.  (ECF No. 130 at 6.)  According to plaintiff, Atienza's prescription of only 50 mg. of tramadol violated that "order."  Plaintiff states that Atienza threatened to put him on "CTQ" (confinement to quarters) if he did not stop bothering Atienza about pain medication.  (Id. at 26.)

Finally, plaintiff's allegations against Dr. Bhatia are as follows.  In 2017 Dr. Bhatia became plaintiff's primary care physician and discontinued plaintiff's tramadol prescription.  (ECF No. 130 at 8.)  Plaintiff contends that Bhatia did so in reliance on a report that plaintiff was hoarding or "cheeking[1]" medication.  That report was authored by Nurse Ramon Delgado when plaintiff was at Ironwood State Prison in 2010.  Plaintiff claims the report was untrue and he was never charged with a disciplinary violation.  (Id. at 8-9, 15.)  Plaintiff further argues that Bhatia "overwr[o]te the order from the chief doctor," Dr. Church, when he discontinued the medication.  (Id. at 11.)

In his opposition, plaintiff includes the argument that Bhatia violated his rights when he refused to allow staff to help plaintiff transfer from his wheelchair to his bed.  However, this court found plaintiff failed to state a cognizable claim on that basis and it was dismissed from this case.  (See ECF No. 81.)  Plaintiff's current allegations do not make the claim any more viable and this court will not consider it here.

### A. Legal Standards for Eighth Amendment Medical Claim

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986); Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

---

[1] Cheeking is a term prisons use to describe prisoners' attempts to hoard medication by tucking the medication into their cheeks rather than swallowing it.  The prisoners then store the medication in their cells for various reasons, including to sell or to take at a later, but non-prescribed, time.  (Atienza Decl. (ECF No. 125-6 at 4-5).)

1   Neither accident nor negligence constitutes cruel and unusual punishment, as "[i]t is obduracy

2   and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited

3   by the Cruel and Unusual Punishments Clause." Whitley, 475 U.S. at 319.

4        What is needed to show unnecessary and wanton infliction of pain "varies according to

5   the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992)

6   (citing Whitley, 475 U.S. at 320).  In order to prevail on a claim of cruel and unusual punishment,

7   however, a prisoner must allege and prove that objectively he suffered a sufficiently serious

8   deprivation and that subjectively prison officials acted with deliberate indifference in allowing or

9   causing the deprivation to occur.  Wilson, 501 U.S. at 298-99.

10        For an Eighth Amendment claim arising in the context of medical care, the prisoner must

11   allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to

12   serious medical needs." Estelle, 429 U.S. at 106.  An Eighth Amendment medical claim has two

13   elements: "the seriousness of the prisoner's medical need and the nature of the defendant's

14   response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on

15   other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

16        A medical need is serious "if the failure to treat the prisoner's condition could result in

17   further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974

18   F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  Indications of a serious medical need include

19   "the presence of a medical condition that significantly affects an individual's daily activities." Id.

20   at 1059-60.  By establishing the existence of a serious medical need, a prisoner satisfies the

21   objective requirement for proving an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S.

22   825, 834 (1994).

23        If a prisoner establishes the existence of a serious medical need, he must then show that

24   prison officials responded to the serious medical need with deliberate indifference.  See Farmer,

25   511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials deny,

26   delay, or intentionally interfere with medical treatment, or may be shown by the way in which

27   prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94 (9th

28   Cir. 1988).

Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06); see also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'"  Farmer, 511 U.S. at 835.

Delays in providing medical care may manifest deliberate indifference.  Estelle, 429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful.  See Hallett v. Morgan, 296 F.3d 732, 745-46 (9th Cir. 2002); Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a] prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

Finally, mere differences of opinion between a prisoner and prison medical staff or between medical professionals as to the proper course of treatment for a medical condition do not give rise to a § 1983 claim.  See Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

**B.  Undisputed Material Facts Applicable to all Medical Claims**

Defendants filed a Statement of Undisputed Facts ("DSUF") as required by Local Rule 260(a).  (ECF No. 125-3.)  Plaintiff's filings in opposition to defendant's motion for summary judgment fail to comply with Local Rule 260(b).  Rule 260(b) requires that a party opposing a motion for summary judgment "shall reproduce the itemized facts in the Statement of Undisputed

1   Facts and admit those facts that are undisputed and deny those that are disputed, including with

2   each denial a citation to the particular portions of any pleading, affidavit, deposition,

3   interrogatory answer, admission, or other document relied upon in support of that denial."

4   Plaintiff's opposition to the summary judgment motion consists of briefing, several

5   "declarations,[2]" and copies of some prison records, primarily plaintiff's medical records and his

6   prison appeals.  (ECF No. 130.)

7          In light of plaintiff's pro se status, the court has reviewed plaintiff's filings in an effort to

8   discern whether he denies any material fact asserted in defendants' DSUF or has shown facts that

9   are not opposed by defendants.  The court also considers the statements plaintiff made in his

10  verified fourth amended complaint and of which he has personal knowledge.

11         The following facts relate to each of plaintiff's Eighth Amendment claims and are not

12  disputed.

13         • Plaintiff has been an inmate, primarily housed at CHCF, since 2014.  (Fourth Am.

14            Comp. (ECF No. 74).)

15         • Defendant Hlaing was a physician at CHCF in 2014 and 2016.  (Decl. of M.

16            Hlaing (ECF No. 125-5).)  Defendant Atienza was a physician at CHCF in 2017.

17            (Decl. of R. Atienza (ECF No. 125-6).)  Defendant Bhatia was a physician at

18            CHCF in late 2017 and early 2018.  (Decl. of R. Bhatia (ECF No. 125-7).)

19         • Plaintiff has a history of the abuse of cocaine and methamphetamine.  His medical

20            records reflect that history of abuse.  (DSUF Nos. 3, 4.)

21         •  In July 2010, plaintiff had an MRI of his lower spine.  The results showed

22            plaintiff had "[m]inor degenerative changes at L4/5 with minimal bilateral neural

23  ////

24  ////

25  _____

26  [2] Plaintiff provides two non-party declarations in support of his opposition.  (ECF No. 130 at 33-
    35.)  Defendants object to these declarations.  (ECF No. 132.)  Neither declaration is signed, as
27  required by Local Rule 131(b).  Moreover, both declarations involve plaintiff's complaint about
    Hlaing's conduct in 2014, which, as described above, is no longer at issue in this case.
28  Accordingly, this court will not consider the two non-party declarations.

foraminal narrowing.  No significant canal or foraminal stenosis is seen.[3]"  (ECF No. 130 at 98.)

- In an interdisciplinary progress note, Nurse Delgado at Ironwood State Prison, where plaintiff was incarcerated in 2010, described seeing plaintiff hoarding his medication on December 29, 2010.  (DSUF No. 5; Ex. J (ECF No. 125-9 at 149).)

- Hoarding is a term used to describe the process whereby an inmate conceals in his mouth for later and improper use one or more pills he was supposed to swallow.  (DSUF No. 6.)

- On December 30, 2010, a prison nurse practitioner added a note that "a morphine taper started" and that plaintiff was "scheduled for MD line to discuss."  (Ex. J (ECF No. 125-9 at 149).)

- In a note to plaintiff's medical file on January 4, 2011, a doctor noted the hoarding and stated that plaintiff had been weaned off morphine.  The doctor added that plaintiff "is unlikely to be a suitable candidate for opioid therapy in the future." (Ex. J (ECF No. 125-9 at 150).)

- Plaintiff had an X-ray of his lumbar spine in February 2014.  It showed, "Bony structures are intact.  The discs are normal. No spondylolisthesis is seen."  (Ex. K (ECF No. 125-9 at 154).)

- A June 2016 X-ray of plaintiff's lumbar spine showed "mild degenerative changes." The radiologist's impressions were:  "Mild Levoscoliosis and Degenerative Spondylosis."  (ECF No. 130 at 208.)

---

[3] Plaintiff presents a copy of a 1995 radiology report by a Dr. Ochoa that showed "major degenerative changes" at the L4/L5 part of in his spine.  (ECF No. 130 at 87, 427.)  Defendants dispute the authenticity of that report.  (See ECF No. 131 at 6.)  Defendants point out that another court observed with respect to a similar radiology report - which was also dated August 11, 1995, contained spelling errors, and was submitted by Juarez in opposition to summary judgment - that it appeared to have been fabricated.  See Juarez v. Delgado, No. ED-cv-130275-DDP-AS, 2016 WL 3660613, at *2-6 (C.D. Cal. Feb. 23, 2016), rep. and reco. adopted, 2016 WL 3670989 (C.D. Cal. July 6, 2016).  This court need not resolve the question of the authenticity of plaintiff's exhibit because defendants could reasonably rely on the much more recent imaging results, which consistently showed no significant abnormalities.

- In March 2017, plaintiff had an MRI of his spine.  It showed mild disk degeneration and mild joint facet disease (i.e., arthritis).  The MRI showed no central canal stenosis (i.e., pinched nerves).  (DSUF No. 74; Ex. M (ECF No. 125-9 at 158); ECF No. 130 at 427.)

- In April 2017, plaintiff had x-rays of his left shoulder and right knee.  (DSUF No. 71; Ex. M (ECF No. 125-9 at 158); ECF No. 130 at 424-25.)  The x-ray of plaintiff's shoulder showed only mild degenerative spondylosis (i.e., age-related changes of the bones).  (DSUF No. 72.)  The x-ray of plaintiff's knee showed a sclerotic irregularity along proximal medial tibial plateau (i.e., a small lesion in the knee that often causes no symptoms).  (DSUF No. 73.)

- On October 12, 2017, plaintiff had a consultation with an orthopedic surgeon at San Joaquin General Hospital.  The doctor diagnosed plaintiff with "myofascial pain syndrome."  He found no "structural abnormalities" and did not think surgery was appropriate for plaintiff's back or shoulder.  He recommended:  "conditioning with therapy, home exercise program, muscle relaxers, anti-inflammatories if tolerable, pain management referral, potential psychiatry referral."  (Ex. JJ (ECF No. 125-9 at 244-45).)

- On November 14, 2017, plaintiff saw a physiatrist for an evaluation.  In the history section of his report, the physiatrist noted plaintiff's "significant mental health history" and "history of polysubstance abuse, including amphetamines, marijuana and cocaine" and that he "was found to be hoarding morphine."  The report further documented that plaintiff had "a history of misrepresenting his functional status" and that he had most recently began "engaging in self harm for the purposes of obtaining medication and manipulating staff."  The report also found that plaintiff was misrepresenting his functional status during the consultation.  Finally, the report noted that plaintiff intended to injure himself in a "fall" if his medical demands were not met.  (Ex. NN (ECF No. 125-9 at 253-54).)

////

- In January 2018, plaintiff had X-rays of his lumbar spine.  The radiologist found nothing "acute" and noted only "[m]ild bilateral facet arthropathy."  (ECF No. 130 at 421.)

- Tramadol is a prescription synthetic opiate (narcotic) painkiller.  (DSUF No. 14.) Tramadol has many of the same effects as other opiate medications.  (DSUF No. 16.)  Opiate painkillers, like tramadol, can be highly addictive and result in abuse and dependence in those who take them for euphoric effect outside of their medical applications.  (DSUF No. 17.)  Patients taking tramadol may develop a tolerance, meaning their body needs higher and higher amounts of the drug to achieve relief effects.  (DSUF No. 18.)  Patients taking tramadol may become dependent on the drug, meaning they cannot reduce or stop the drug without experiencing adverse effects.  (DSUF No. 19.)  And patients taking tramadol may become addicted, meaning they seek out and crave the medication despite its adverse effects. ( DSUF No. 20.)  These risks are amplified when treating patients with histories of substance abuse.  (DSUF No. 21.)  And in addition to the risk of developing a tolerance, dependence, and addiction, serious side effects of tramadol can also include serotonin syndrome, serious breathing problems, adrenal insufficiency, androgen deficiency, and seizures.  (DSUF No. 22.)  A tramadol overdose can result in serious injury or death.  (DSUF No. 23.)

- California Prison Health Care Services ("CPHCS") published Pain Management Guidelines in 2009.  (Ex. KK (ECF No. 125-9 at 234).)  Those guidelines provide the following standards for providing opioid medications for a patient with chronic pain.  First, opioids should only be considered when a "patient is unresponsive to non opioid analgesics and adjuvant medications and has severe pain persisting for >30 days" and the patient has both "[i]mpaired function" and

> Ongoing objective evidence of severe disease (i.e. evidence of severe degenerative disease on imaging tests or exam, evidence of nonhealing fractures or tears, EMG evidence of neuropathy consistent with anatomic defects, non healing

1
2
wounds, or evidence of inflammation on lab studies with
clinical findings consistent with inflammatory condition).

3
(Id. at 239.)

4
### C. Analysis of Eighth Amendment Claims

5
#### 1. Claim against Dr. Hlaing

6
Plaintiff's only possibly cognizable Eighth Amendment claim against Dr. Hlaing is that in

7
2016, Hlaing discontinued plaintiff's tramadol prescription.  (ECF No. 130 at 4-5, 18, 25.)  In a

8
copy of a 602 appeal filed with the prison, plaintiff explains that in May 2016 he was moved to a

9
new part of the prison.  At the time he was moved, he was being prescribed 100 mg. of tramadol

10
every eight hours.  However, after the move, Dr. Hlaing reduced his prescription to 50 mg. every

11
twelve hours for ten days.  (Id. at 390-91.)  In his opposition, plaintiff contends Hlaing reduced

12
his prescription based on the 2010 report of nurse Delgado that plaintiff had hoarded his

13
medication.  (Id. at 4-5.)

14
Defendants argue that plaintiff should not be permitted to proceed on this 2016 claim

15
because, in his deposition, plaintiff testified that his only claim against Hlaing involved his

16
conduct in May 2014.  (Ex. UU (ECF No. 125-9 at 299-300).)  However, even if this court

17
considers plaintiff to have properly alleged a claim regarding Hlaing's conduct in 2016, there is

18
insufficient evidence in the record to support such a claim.  While plaintiff argues that the report

19
by Delgado was wrong, it was part of plaintiff's medical record.  The simple fact that Hlaing

20
relied, at least in part, on the report of medical staff in plaintiff's medical record to make a

21
decision about plaintiff's health care does not demonstrate deliberate indifference.

22
Summary judgment should be granted for defendant Hlaing on plaintiff's Eighth

23
Amendment claim against him.

24
#### 2. Eighth Amendment Claims against Dr. Atienza

25
Plaintiff testified during his deposition that his Eighth Amendment claims against Dr.

26
Atienza are: (1) on June 22, 2017, Dr. Atienza took him off of his medication, which at that time

27
was tramadol and gabapentin, and (2) Dr. Atienza prescribed him only 50 mg. of tramadol twice

28
per day when he returned to CHCF from MCSP in October 2017.  (ECF No. 125-9 at 301-02,

305-06, 308-10, and 319-20.)  In his deposition, plaintiff explained this latter claim.  He contends that during his second hunger strike in 2017, he had a meeting with Dr. Church, the Chief Medical Officer.  They came to an "agreement" and Dr. Church ordered plaintiff to be prescribed 100 mg. of tramadol three times a day.  However, Dr. Atienza violated that "order" when he prescribed only 50 mg. twice a day.  (Id. at 305-06; see also ECF No. 130 at 6.)

Defendants provide a detailed description of Atienza's treatment of plaintiff during 2017. A review of plaintiff's filings shows that he does not dispute any of these facts.  Rather, plaintiff appears to base his arguments primarily on two things.  First, he focuses on doctors' reliance on reports in his medical record that he previously hoarded opioid medication and that he has overstated his pain.  Plaintiff argues that those reports are not true.  Second, plaintiff contends that Atienza failed to prescribe medication sufficient to control his pain.

### a.  Undisputed Facts re Dr. Atienza's Conduct

Dr. Atienza was plaintiff's primary care physician for much of 2017.  Atienza had reviewed plaintiff's medical record.  He was aware of the following from those records:  (1) plaintiff had previously been caught hoarding narcotics (DSUF Nos. 7, 65-66); (2) plaintiff had a history of polysubstance and alcohol abuse (DSUF No. 6); and (3) another physician, Dr. Monks, had recently noted her concern that plaintiff was malingering and misrepresenting his level of function  (DSUF No. 68).

Dr. Atienza met with plaintiff for a routine visit on April 25, 2017.  At that visit, plaintiff complained of chronic low back pain and pain in his right knee and left shoulder.  (DSUF No. 69; Ex. M (ECF No. 125-9 at 158).)  Atienza examined plaintiff's back, right knee, and shoulder. (DSUF No. 70.)  Atienza also reviewed plaintiff's recent imaging studies, which included an April 1, 2017 x-ray of his left shoulder, an April 6, 2017 x-ray of his right knee, and a March 1, 2017 MRI of his back.  (DSUF No. 71.)  The x-ray of plaintiff's shoulder showed only mild degenerative spondylosis, which is an age-related change of the bones.  (DSUF No. 72.)  The x-ray of Juarez's knee showed a small lesion in the knee that often causes no symptoms.  (DSUF No. 73.)  And the MRI of plaintiff's back showed mild disk degeneration and mild arthritis, which occurs from the natural wear and tear in joints over time.  (DSUF No. 74.)  The MRI

1   showed no pinched nerves, which indicated to Dr. Atienza that any pain plaintiff was

2   experiencing was not nerve related.  (DSUF No. 75.)

3        Dr. Atienza continued plaintiff on his existing pain medications, including acetaminophen,

4   gabapentin, and tramadol.  (DSUF No. 77.)  During two subsequent visits with plaintiff, on May

5   8, 2017, and May 18, 2017, Atienza did not alter this course of pain treatment.  (DSUF No. 78;

6   Ex. O (ECF No. 125-9 at 164-67).)

7        During a May 23, 2017 visit with Dr. Atienza, plaintiff complained of lower back and left

8   shoulder pain, although he looked comfortable to Atienza.  (DSUF No. 79; Ex. P (ECF No. 125-9

9   at 169-70).)  When Dr. Atienza lightly palpated plaintiff's back, his response appeared to Atienza

10  to be exaggerated and inappropriate.  (DSUF No. 80.)  In his notes from that visit, Dr. Atienza

11  wrote:

12
13      Chronic Pain.  I believe patients pain is musculoskeletal and not
    neuropathic in nature.  I advised patient that his gabapentin (and even
    tramadol) might be inappropriate, especially if his perceived 7-8 of
14  10 pain is persistent and unimproved.  I discussed about possibly
    discontinuing these meds as benefits do not outweigh risks.  I advised
15  patient to do gentle stretching and activity modification; also
    relaxation techniques to help pain with nonpharmacologic measures.
16  I will give patient a chance to think about my recommendations, esp
    pain meds.

17  (Ex. P (ECF No. 125-9 at 170).)  Dr. Atienza did not change plaintiff's medications at that time.

18  He recommended a follow-up appointment in 28 days.  (Id.)

19       Dr. Atienza had the routine follow-up appointment with plaintiff on June 22, 2017, during

20  which Atienza observed that plaintiff was using his wheelchair without difficulty.  (DSUF No.

21  86; Ex. Q (ECF No. 125-9 at 172-73).)  In his notes from that visit, Atienza recorded details from

22  plaintiff's medical record that plaintiff "manipulates for secondary gain of equipments and

23  narcotics.  He forged medical documents and used a typed up fake MRI report dated 1995 stating

24  he has severe L spine disease.  But MRI done 7/12/10 showed only minor DJD [degenerative disk

25  disease].  EMG of bilateral lower extremities done on 5/8/14 was negative."  (Id. at 172.)  Dr.

26  Atienza also opined that plaintiff was "functional and able to do ADLs [activities of daily

27  living]."  (Id. at 173.)

28  ////

In the assessment plan for the June 22 visit, with respect to plaintiff's chronic pain, Dr. Atienza wrote:  "As previously discussed with patient, pain is musculoskeletal and not neuropathic in nature.  I will wean him off gabapentin and discontinue tramadol.  I will prescribe non-opiate analgesics (except NSAIDs) and patient should continue gentle stretching and activity modification; also relaxation techniques."  (Ex. Q (ECF No. 125-9 at 173).)  Atienza prescribed acetaminophen for plaintiff's pain.  (Ex. R (ECF No. 125-9 at 177).)

On July 11, 2017, Dr. Atienza had a routine visit with plaintiff.  (DSUF No. 94; Ex. S (ECF No. 125-9 at 179-80).)  Atienza noted that plaintiff "has not gone to PT.  [H]e maintains that his pain is severe and cannot function."  (Id. at 179.)  However, Atienza also noted that "[p]rior to today's appointment patient was in the library.  I saw him return from the library and [] maneuvering his wheelchair without difficulty."  (Id.)  The notes also reflect that plaintiff was, at the time, on a hunger strike.  Dr. Atienza did not alter his course of treating plaintiff's complaints of pain, except to encourage plaintiff to attend the physical therapy consultations that he had ordered.  (Id. at 180.)

When Dr. Atienza saw plaintiff again on July 30, 2017, his course of treating plaintiff's complaints of pain was unaltered, except that he told plaintiff he would attempt to obtain a specialty consultation for plaintiff to see an orthopedic surgeon for a possible facet joint injection for his chronic lower back pain, a pes anserine bursal injection for his knee, and a tender point injection for his shoulder.  (DSUF No. 97; Ex. W (ECF No. 125-9 at 189-90).)  Atienza processed a request for this referral on August 4, 2017.  (Ex. X (ECF No. 125-9 at 192).)

Dr. Atienza saw plaintiff on August 8, 2017, and his course of treating plaintiff's complaints of pain remained the same, except that he ordered plaintiff another physical therapy consultation and noted that he would follow up on the referral to an orthopedic surgeon.  (DSUF No. 99; Exs. Y and Z (ECF No. 125-9 at 194-98).)

Dr. Atienza saw plaintiff on August 15, 2017, and his course of treating plaintiff's complaints of pain did not change.  (DSUF No. 100; Ex. BB (ECF No. 125-9 at 204-05).)  During that visit, Atienza viewed the results of a recent computer tomography ("CT") scan of plaintiff's head and cervical spine, which were done after plaintiff had a fall.  The CT scan results were

1  unremarkable.  (Id.)

2      Plaintiff's medical records show that he had an appointment with a physiatrist to discuss

3  physical therapy and rehabilitation on August 28, 2017 but refused to attend it.  (Ex. V (ECF. No.

4  125-9 at 187).)

5      Dr. Atienza next saw plaintiff on September 5, 2017, and his course of treating plaintiff's

6  complaints of pain was again unaltered, although he told plaintiff that he had ordered him another

7  physiatry consultation.  (DSUF No. 102; Ex. DD (ECF No. 125-9 at 209-10).)

8      Plaintiff refused to be seen by Dr. Atienza on September 26, 2017.  At that time, plaintiff

9  was participating in another hunger strike. (DSUF No. 104; Ex. EE (ECF No. 125-9 at 212-13).)

10      On September 27, 2017, mental health staff requested that Dr. Atienza evaluate plaintiff

11  for a medical clearance for transfer to a mental health crisis bed ("MHCB").  (DSUF 105; Ex. FF

12  (ECF No. 125-9 at 215-16).)  MHCBs are located in facilities with 24-hour mental health care.

13  (DSUF No. 105.)  A psychologist's notes indicate concern that plaintiff had expressed suicidal

14  ideation with a plan to die by starvation.  Plaintiff also informed the psychologist that he would

15  end the hunger strike if given his pain medications or if he could speak with the Pain

16  Management Committee.  (Ex. GG (ECF No. 125-9 at 222-23).)  According to Atienza's notes,

17  plaintiff was at that time on his 20th day of a hunger strike.  (ECF No. 125-9 at 215.)  Dr. Atienza

18  observed that plaintiff was medically stable for a transport to a MHCB and provided a medical

19  clearance for the transport.  (DSUF Nos. 106, 107; Ex. FF (ECF No. 125-9 at 215-16).)  On

20  September 27, plaintiff was accepted for a transfer to a MHCB at Mule Creek State Prison.

21  (DSUF No. 111; Ex. HH (ECF No. 125-9 at 224).)

22      Dr. Atienza saw plaintiff when he returned to CHCF on September 30, 2017.  Atienza's

23  course of treating plaintiff's complaints of pain remained the same.  (DSUF No. 112; Ex. II (ECF

24  No. 125-9 at 226-27).)  Atienza noted that staff reported plaintiff was continuing his hunger

25  strike.  (Id. at 226.)

26      Dr. Atienza saw plaintiff again on October 2, 2017.  (DSUF No. 113; Ex. JJ (ECF No.

27  125-9 at 229-32).)  At the time, Atienza still had not received the results from plaintiff's physiatry

28  or orthopedic referrals; plaintiff had not yet had those appointments.  (DSUF No. 118.)  In his

notes of this appointment, Atienza wrote regarding plaintiff's chronic pain:

> Re-start tramadol temporarily for chronic. Benefits and risks of tramadol discussed with patient.
>
> I have discussed chronic pain with patient on multiple occasions and stressed importance of activity modification and various pharmacologic options (especially non-opiate analgesics). I also discussed in the past about inappropriateness of gabapentin for his pain. He was referred to PMR, PT and orthopedics. Patient was resistant to use of non-opiate analgesics (acetaminophen), activity modification, etc; and failed to actively participate in these referrals.

(Ex. JJ (ECF No. 125-9 at 230).)

The records also show that physicians who saw plaintiff after his October 2017 appointment with Dr. Atienza were, for the most part, in agreement that tramadol or other opioids should not be prescribed.  In November 2017, Dr. Bhatia authorized continuation of the "short course" of tramadol, but determined that narcotics should be avoided.  (Ex. MM (ECF No. 125-9 at 250).)  By November 21, 2017, plaintiff's prescription of tramadol had ended.  He had an appointment with Dr. Bhatia on that date at which time Bhatia informed him that he would not be prescribed narcotics.  (Ex. PP (ECF No. 125-9 at 267-68).)  In December 2017, Dr. Manohar also found "no need for tramadol" and continued plaintiff's prescription for acetaminophen.  (ECF No. 130 at 190.)  In January 2018, Dr. Farhat continued the Tylenol prescription.  (Id. at 182.)

In early March 2018, Dr. South prescribed a "trial" of tramadol for plaintiff's lower back pain because plaintiff reported that Tylenol was not helping.  (ECF No. 130 at 172-73.)  Dr. South saw plaintiff again on March 16, 2018  and continued the tramadol prescription.  (Id. at 167-68.)

In late March 2018, Dr. Naseer noted that plaintiff's "prolonged" tramadol prescription had "not improved patient function."  (ECF No. 130 at 165.)  On June 27, 2018, Dr. Naseer noted that plaintiff had been on tramadol for about three months, but there was "no observed benefit from Tramadol."  Naseer also noted plaintiff's "prior history of drug addiction and drug seeking behaviors."  (Id. at 146.)  Two days later, Dr. Naseer again saw plaintiff.  He found "no objective evidence of severe pain while [plaintiff] was on Tramadol and also when he is not on Tramadol."  He informed plaintiff that for chronic generalized pain, long-term use of narcotics is not medically indicated.  (Id. at 484.)

1    On July 6, 2018, Dr. Singh noted that plaintiff wanted only tramadol to treat his pain.

2    Singh explained "tramadol is not medically indicated for this type of chronic pain." (Id. at 142.)

3    Later in July 2018, Dr. Naseer noted that tramadol was "not indicated or justified" for plaintiff.

4    He further noted that plaintiff was "being manipulative to get tramadol or other narcotics by

5    going into hunger strike." (Id. at 478.)  In September 2018, Naseer noted plaintiff's "long history

6    of misrepresenting his functions. . . . Avoid narcotics for pain." (Id. at 120.)

7                    **b.  Was Atienza Deliberately Indifferent to Plaintiff's Medical Needs?**

8    For purposes of this analysis, this court assumes that plaintiff's pain was a "serious

9    medical need" under the Eighth Amendment.  The question, then, is whether Atienza acted with

10   deliberate indifference to that pain on the two occasions identified by plaintiff:  (1)  June 22,

11   2017, when Atienza discontinued plaintiff's gabapentin and tramadol prescriptions, and (2)

12   October 2017, when Atienza prescribed plaintiff 50 mg. of tramadol rather than the 100 mg.

13   plaintiff claims had been ordered.

14                            **(i)  June 22, 2017 Incident**

15   Plaintiff presents little evidence to support his contention that Atienza discontinued his

16   tramadol and gabapentin prescriptions in deliberate indifference to his pain.  Primarily, plaintiff

17   just argues that the narcotic pain medication was the only thing relieving his pain.  Plaintiff also

18   argues that Atienza discontinued his medication in reliance on the 2010 report that plaintiff had

19   violated his pain medication contract by hoarding medication.  (See ECF No. 130 at 354.)

20   Plaintiff does allege one or two incidents involving Atienza that could be construed as

21   reflecting his state of mind around the time he discontinued plaintiff's medications.  Plaintiff

22   states that on June 22, 2017, Atienza told him "there is nothing wrong with you and you are not in

23   pain, I will not going to give you anything, I don't care whats you are doing, if you have a case or

24   whatever, while you are in this building with me, you don't have nothing c[o]ming." (ECF No.

25   130 at 7, 355.)  Plaintiff also states that in July 2017, Atienza told him he was "manipulating the

26   department" and that he complained "so much that [he] might not get any more health care" from

27   Atienza.  (Id. at 263.)

28   ////

Even assuming the truth of these statements, they are insufficient to establish deliberate indifference because plaintiff's medical records show Atienza's actions were not consistent with them.  First, on June 22, 2017, Atienza did not give plaintiff "nothing."  Rather, he prescribed acetaminophen and physical therapy.  Further, Atienza's notes of his visits with plaintiff show that Atienza took numerous factors into consideration when he decided to discontinue plaintiff's gabapentin and tramadol.  He did not make that decision based solely on a frustration with plaintiff that the statements might indicate.

Second, the July statement regarding plaintiff being manipulative was, if true, a feeling shared by other medical providers, as described above.  Several doctors noted that they felt plaintiff was malingering and overstating his symptoms in attempts to obtain narcotics.  Atienza's notes from plaintiff's appointments on June 22 and July 11, 2017 state that he saw plaintiff using his wheelchair without difficulty.  The statement that plaintiff might no longer get care is refuted by the fact plaintiff saw Atienza several times after July 2017.  In fact, on July 30, 2017, Atienza referred plaintiff to an orthopedic surgeon for a consultation regarding possible injections for his pain.

Atienza's declaration, and plaintiff's medical records, show that Atienza exercised reasonable medical judgment to determine that it was in plaintiff's best interests to discontinue narcotic pain relievers in June 2017.  Other doctors who saw plaintiff both before and after that time agreed.

Further, the prison system's pain management guidelines recommended the use of opioids for chronic pain only where the patient has both impaired function and objective evidence of a basis for the pain.  Atienza had reason to believe that plaintiff did not meet either of these qualifications.  Based on his observations of plaintiff, and notations from other doctors and medical staff in plaintiff's records, Atienza had reason to believe plaintiff was overstating his pain-related impairments.  In addition, while plaintiff complained nurse Delgado's 2010 report that he had hoarded morphine was not true, that report was part of plaintiff's medical file. Atienza was entitled to rely on the reports of other medical professionals in determining the best course of treatment.  See, e.g., Todd v. Bigelow, 497 F. App'x 839, 840 (10th Cir. 2012) ("even if

19

staff was incorrect to conclude that [plaintiff] intended to abuse his medication," their assessment "reflects a legitimate penological interest in preventing drug abuse").

Plaintiff also did not meet the second qualification set out in the pain management guidelines. Plaintiff's medical records, which included several recent imaging reports, did not show an objective basis for plaintiff's complaints of severe pain.

Doctors' decisions to discontinue narcotics or opioids in favor of safer medications have been found medically acceptable in other cases in this court. See e.g., Montiel v. Taher–Pour, No. 1:11cv2145 LJO DLB PC, 2014 WL 2574533 (E.D. Cal. June 9, 2014), rep. and reco. adopted, 2014 WL 3615801 (E.D. Cal. July 22, 2014) (granting defendants' motion for summary judgment on plaintiff's Eighth Amendment claim challenging abrupt discontinuance of tramadol and four-day taper of gabapentin, with the use of an alternative prescription for ibuprofen); Solomon v. Negrete, No. 2:10–cv–2103 WBS AC P, 2014 WL 546367 (E.D. Cal. Feb.11, 2014), rep. and reco. adopted, 2014 WL 1024567 (E.D. Cal. Mar.14, 2014) (granting defendant's motion for summary judgment on plaintiff's Eighth Amendment claim challenging the discontinuance of a morphine prescription, then tapering of tramadol and gabapentin over one-week period, with the use of an alternate prescription for ibuprofen); Fischer v. Algers, No. 2:12–cv-2595 MCE CKD P, 2014 WL 3385184 (E.D. Cal. July 10, 2014) (recommending defendants' motion for summary judgment be granted on plaintiff's Eighth Amendment claim challenging his taper by prison medical staff from morphine, to Tylenol 3 with codeine, to ibuprofen), rep. and reco. adopted, No. 2:12-cv-2595 MCE CKD P (E.D. Cal. Aug. 15, 2014).

The undisputed facts before this court show that Dr. Atienza's June 22, 2017 decision to discontinue plaintiff's tramadol and gabapentin prescriptions was medically acceptable.

**(ii)  October 2017 Incident**

With respect to plaintiff's argument that Atienza violated Dr. Church's "order" that he receive 100 mg. of tramadol three times a day, plaintiff provides no support for that assertion. Nothing in the medical records provided by either plaintiff or defendants demonstrates that Dr. Church, or any other doctor, prescribed, much less ordered plaintiff be prescribed, 100 mg. of tramadol three times a day in 2017. Rather, plaintiff was prescribed 50 mg. twice a day in early

20

1   2017 and again in October 2017, Atienza prescribed 50 mg. twice a day again in an attempt to

2   encourage plaintiff to start eating.  Even if Church had prescribed 100 mg. three times a day, a

3   "difference of opinion … between medical professionals… concerning what medical care is

4   appropriate" "does not amount to deliberate indifference."  Colwell v. Bannister, 763 F.3d 1060,

5   1068 (9th Cir. 2014) (citations omitted).

6        The record shows that Atienza prescribed acetaminophen, referred plaintiff to physical

7   therapy, and referred him to an orthopedic surgeon to consider the possibility of injections to

8   relieve plaintiff's pain without narcotics.  The record further shows that plaintiff was not

9   compliant with recommended therapies.  Plaintiff has not shown Atienza acted with deliberate

10  indifference to his serious medical needs in either June or October 2017.

11       Summary judgment should be granted in Atienza's favor on plaintiff's Eighth Amendment

12  claims against him.

13       **3. Eighth Amendment Claim against Dr. Bhatia**

14       Plaintiff alleges Dr. Bhatia discontinued plaintiff's tramadol prescription in 2017 after he

15  became plaintiff's primary care physician.  (ECF No. 130 at 8.)  Plaintiff contends that Bhatia did

16  so in reliance on the report of Nurse Delgado in 2010 that plaintiff was hoarding or "cheeking"

17  medication.  Plaintiff claims the report was untrue and he was never charged with a disciplinary

18  violation.  (Id. at 8-9, 15.)  Plaintiff further argues that Bhatia "overwr[o]te the order from the

19  chief doctor," Dr. Church, when he discontinued the medication.  (Id. at 11.)  The records

20  provided by the parties show the following facts, which do not appear to be in dispute, regarding

21  Bhatia's care of plaintiff.

22       **a. Undisputed Facts re Bhatia's Conduct**

23       Dr. Bhatia was plaintiff's primary care physician for a short time – November and

24  December 2017.  (Bhatia Decl. (ECF No. 125-7 at 3).)

25       Dr. Bhatia saw plaintiff on November 14, 2017.  Bhatia noted that plaintiff appeared

26  comfortable and in no apparent distress.  He also noted that plaintiff was then on a short course of

27  tramadol, 50 mg. twice a day.  He determined that this short course of tramadol should be

28  continued but that "narcotic analgesic agents" should be avoided.

1   (Ex. MM (ECF No. 125-9 at 249-50).)

2      Dr. Bhatia next saw plaintiff on November 21, 2017.  He noted that nursing staff reported

3   "inconsistencies between [plaintiff's] stated level of function and observed activities."  Bhatia

4   described a discussion he had with plaintiff about why he was not renewing plaintiff's tramadol

5   prescription:

6       I had a long conversation with patient about why we were not
        prescribing narcotic analgesics for his chronic pain.  I informed him

7       that we had done a number of diagnostic studies and had not found
        any objective findings that would be responsible for chronic pain.  I

8       informed him that the use of chronic narcotic analgesics in such a
        situation is not therapeutic, has little benefit and can have significant

9       harms. . . .

10      Of note, the patient has an established history of misrepresenting his
        functional status, along with falls and hunger strikes and other self

11      injurious behaviors following staff declining patient requests.

12  (ECF No. 130 at 197; Ex. QQ (ECF No. 125-9 at 270); Bhatia Decl. (ECF No. 125-7 at 5).)

13  Bhatia prescribed 650 mg. of acetaminophen twice a day.  (Id.)

14      On November 28, 2017, Dr. Bhatia again saw plaintiff.  Bhatia's notes state:  "Patient is

15  continuing to report pain all over his body."  In addition, plaintiff reported nausea.  Bhatia wrote

16  that plaintiff requested pain medication and was told:  "the medical team will not prescribe new

17  pain medications primarily because we have not found any objective evidence of a source of

18  pain."  Bhatia prescribed physical therapy and continued plaintiff on acetaminophen for pain.

19  (ECF No. 130 at 196; Ex. RR (ECF No. 125-9 at 273-74).)

20      On December 6, 2017, Dr. Bhatia had another visit with plaintiff.  In his notes from that

21  visit, Bhatia wrote that plaintiff reported "pain and soreness all over his body."  Plaintiff reported

22  nausea, depression, and stress.  He told Bhatia that he was not taking his medication because "he

23  feels too bad."  However, Bhatia noted that nursing staff reported seeing plaintiff "frequently out

24  of the housing unit" and "mobile in his wheelchair."  Plaintiff did "not demonstrate any

25  observable signs of pain or distress when active."  Bhatia opined that plaintiff was exaggerating

26  his symptoms and noted that he would "avoid prescribing narcotic analgesics for chronic pain."

27  (ECF No. 130 at 193-94; Ex. TT (ECF No. 125-9 at 278-79).)

28  ////

**b. Was Bhatia Deliberately Indifferent to Plaintiff's Medical Needs?**

Plaintiff simply argues that Bhatia's reliance on the 2010 report that he had hoarded medication demonstrates his deliberate indifference to plaintiff's medical needs. However, the records show that Bhatia relied on a number of factors besides the 2010 hoarding incident to determine that narcotics were not appropriate for plaintiff's complaints of pain. Bhatia relied on: (1) nurses' and his own observations of plaintiff's mobility and apparent lack of distress; (2) the absence of any objective basis for plaintiff's pain; (3) plaintiff's documented history of mis-stating his level of function; (4) plaintiff's history of substance abuse; and (5) the non-therapeutic and potentially harmful results of the long-term use of narcotics.

Bhatia attempted to address plaintiff's pain by prescribing physical therapy and acetaminophen. The fact that plaintiff disagrees with that treatment plan does not mean Bhatia acted with deliberate indifference. The undisputed facts provide no support for plaintiff's Eighth Amendment claim against Bhatia.

Summary judgment should be granted for Bhatia.

**III. Retaliation Claims**

On screening plaintiff's fourth amended complaint, this court found plaintiff stated a retaliation claim against defendant Atienza. (ECF No. 81 at 5.) In his deposition, plaintiff testified that he is alleging Atienza's refusal to prescribe 100 mg. tramadol in October 2017, despite the recommendation of Dr. Church, was retaliatory. (ECF No. 125-9 at 312.) He also testified that Atienza sent him to a MHCB at MCSP in retaliation for plaintiff's complaints against him. (Id. at 312-13, 316; ECF No. 130 at 27.) In his opposition, plaintiff also alleges retaliation by defendants Hlaing and Bhatia when they discontinued his medication. He contends that Bhatia "overwr[o]te the order from the chief doctor," Dr. Church, when he discontinued the medication. According to plaintiff, Bhatia did so in retaliation for plaintiff's "multiple complaints." (ECF No. 130 at 11.) With respect to Hlaing, plaintiff alleges his 2016 discontinuation of plaintiff's pain medication was retaliatory for plaintiff's pursuit of this legal action against Hlaing. (Id. at 18, 25.)

////

1    Defendants argue that plaintiff's claims that Atienza retaliated against him when he

2    ordered a transfer and the retaliation claims against Hlaing and Bhatia are unexhausted.  Plaintiff

3    does not address that contention and this court, therefore, finds it undisputed that plaintiff failed

4    to file appropriate prison appeals through each level of review as required to exhaust these claims

5    of retaliation.  See Jones v. Bock, 549 U.S. 199, 218 (2007); see also Marella v. Terhune, 568

6    F.3d 1024, 1027 (9th Cir. 2009) ("The California prison system's requirements 'define the

7    boundaries of proper exhaustion.'" (citation omitted).).  The Prison Litigation Reform Act of

8    1995 (PLRA) mandates that "[n]o action shall be brought with respect to prison conditions under

9    section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other

10   correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C.

11   § 1997e(a).

12   Therefore, exhaustion is grounds for summary judgment in defendants' favor on most of

13   plaintiff's retaliation claims.  However, even if exhausted, plaintiff cannot succeed on the merits

14   of those claims.  Nor can he succeed on his claim that Atienza retaliated against him in October

15   2017.

16   **A.  Legal Standards for Retaliation Claims**

17   To prove a claim of First Amendment retaliation, plaintiff must establish each of five

18   elements:  (1) a state actor took some adverse action against him, (2) because of (3) his protected

19   conduct, and such action (4) chilled plaintiff's exercise of his First Amendment rights, and (5) the

20   action did not reasonably advance a legitimate correctional goal.  Rhodes v. Robinson, 408 F.3d

21   559, 567-68 (9th Cir. 2005) (footnote and citations omitted).  Under the first element, plaintiff

22   need not prove that the alleged retaliatory action, in itself, violated a constitutional right.  Pratt v.

23   Rowland, 65 F.3d 802, 806 (9th Cir. 1995) (to prevail on a retaliation claim, plaintiff need not

24   "establish an independent constitutional interest" was violated); see also Hines v. Gomez, 108

25   F.3d 265, 269 (9th Cir. 1997) ("[P]risoners may still base retaliation claims on harms that would

26   not raise due process concerns."); Rizzo v. Dawson, 778 F.2d 527, 531 (9th Cir. 1985) (transfer

27   of prisoner to a different prison constituted adverse action for purposes of retaliation claim).

28   ////

24

1    To prove the second element, retaliatory motive, plaintiff must show that his protected

2    activities were a "substantial" or "motivating" factor behind the defendants' challenged conduct.

3    Brodheim v. Cry, 584 F.3d 1262, 1271 (9th Cir. 2009) (quoting Soranno's Gasco, Inc. v. Morgan,

4    874 F.2d 1310, 1314 (9th Cir. 1989)).  The third element includes prisoners' First Amendment

5    right of access to the courts.  Lewis v. Casey, 518 U.S. 343, 346 (1996).  While prisoners have no

6    freestanding right to a prison grievance process, see Ramirez v. Galaza, 334 F.3d 850, 860 (9th

7    Cir. 2003), "a prisoner's fundamental right of access to the courts hinges on his ability to access

8    the prison grievance system," Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995), overruled on

9    other grounds by Shaw v. Murphy, 532 U.S. 223, 230 n. 2 (2001).

10   **B.  Analysis of Retaliation Claims**

11   The undisputed facts provide no basis for a conclusion that any of the defendants' actions

12   were motivated by retaliation for plaintiff's exercise of his First Amendment rights.  First,

13   plaintiff fails to show that Dr. Atienza was responsible for his transfer to a MHCB.  The records

14   show that a psychologist determined that plaintiff should be transferred to a MHCB.  (Ex. GG

15   (ECF No. 125-9 at 222-23).)  Mental health staff then asked Dr. Atienza to evaluate plaintiff for a

16   medical clearance for a MHCB.  (Ex. FF (ECF No. 125-9 at 215-16).)  Atienza observed that

17   plaintiff was medically stable for a transport to a MHCB and provided a medical clearance for the

18   transport.  (Id.)  Plaintiff does not dispute that he was well enough to be transported.  Plaintiff

19   fails to show Atienza made the determination that he was stable for transport based on any

20   retaliatory motive.

21   With respect to plaintiff's contention that Atienza prescribed 50 mg. of tramadol in

22   October 2017 rather than 100 mg., plaintiff again fails to show any retaliatory motive.  Plaintiff

23   makes one assertion, described above, that in June 2017 Atienza mentioned plaintiff's "case."

24   Even if true, that comment was made months before Atienza prescribed the tramadol in October

25   2017.  Plaintiff fails to make any allegations from which a fact-finder could determine Atienza's

26   actions at that time were retaliatory.

27   Plaintiff's contentions against Hlaing and Bhatia fail on the same grounds.  Plaintiff

28   makes no allegations, and the record contains no factual basis, upon which a fact-finder could

determine that Hlaing or Bhatia had retaliatory motives in their treatment of plaintiff.  The undisputed facts show that all defendants had legitimate, medically acceptable basis for their treatment decisions.  Summary judgment is appropriate for all defendants on plaintiff's retaliation claims.

For the foregoing reasons, IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment (ECF No. 125) be granted.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, either party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  May 7, 2020

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DLB1/prisoner-civil rights/juar1996.msj